UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH CORREIA,

    Plaintiff,

v.

FCA US LLC,

    Defendant.

Case No. 16-10485
Honorable Laurie J. Michelson
Magistrate Judge Stephanie Dawkins Davis

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [71]**

Kenneth Correia worked for FCA for over 20 years, first as an engineer and eventually as a Project Chief. He was fired in 2015. FCA asserts it fired him due to poor performance. Correia insists he was fired in retaliation for threatening to report a potential safety defect to the National Highway Traffic Safety Administration (NHTSA). And, he says, this retaliatory act is in violation of the False Claims Act, 31 U.S.C. § 3730(h), and the Michigan Whistleblower Protection Act, Michigan Compiled Laws § 15.362.

FCA now moves for summary judgment. (ECF No. 71.)

For the reasons that follow, the Court will grant in part FCA's motion.

**I.**

Kenneth Correia began his relationship with FCA in 1994 as a Chrysler Institute Engineering Student. (ECF No. 71-14, PageID.699.) He was then hired as an engineer, and eventually became a Project Chief for steering, suspension, mounts, and modules for Ram trucks. (*Id.*)

In July 2015, FCA signed a Consent Order with NHTSA due to FCA's "failure to adequately remedy defective vehicles within a reasonable time in violation of 49 U.S.C. § 30120(a), (c); and violation of the recall reporting and notification requirements under 49 U.S.C. §§ 30118–30119 and 49 C.F.R. §§ 573 and 577." (ECF No. 72-14, PageID.1661.) As part of the Order, FCA agreed to pay a civil penalty of $105,000,000 for its failure to adequately remedy defective vehicles within a reasonable time; for failing to timely notify owners of vehicle defects; for failing to timely submit copies to NHTSA of communications relating to recalls; and for failing to provide NHTSA with "timely, accurate, and complete information relating to vehicle defects and recalls." (ECF No. 72-14, PageID.1665.) Of that total penalty, $15,000,000 was deferred and held in abeyance pending the satisfactory completion of the Order. (ECF No. 72-14, PageID.1666.) The Order further provided that should the Independent Monitor or NHTSA itself determine that FCA "has violated the [National Traffic and Motor Vehicle Safety Act (Safety Act)], regulations thereunder, or the terms of this Consent Order, a lump-sum payment of three million dollars ($3,000,000) from the [$15,000,000 deferred fee] will become due and owing to the U.S. Treasury within ten (10) calendar days, in accordance with the instructions provided by NHTSA." (ECF No. 72-14, PageID.1666.) Second and third violations would trigger additional fees until the entire $15,000,000 deferred fee was remitted to the government. (ECF No. 72-14, PageID.1666–1667.)

Correia became aware of this Order, and in fact read it the month it was signed. (ECF No. 71-14, PageID.724–735.) His understanding of the Order was that it required FCA to raise safety issues to NHTSA within five working days "even if [FCA] suspected it was an issue." (ECF No. 71-14, PageID.735.)

On October 28, 2015, Correia had a call with Paul Kasper, the Fleet Technical Liaison, regarding a complaint from a customer in Atlanta that had purchased about 80 FCA trucks for its

2

fleet of ambulances. (ECF No. 71-14, PageID.733.) Kasper reported that the trucks were having trouble with drag link ball joints that could cause a loss of steering control and thus possible loss of life. (ECF No. 71-14, PageID.733–741.)

As soon as Correia got off the call, he went to speak to his supervisor, Philip Hartnagel. (ECF No. 71-14, PageID.734.) Correia relayed to Hartnagel what he learned on the call and emphasized that Kasper was concerned about possible loss of life from the drag link ball joint issue. (*Id.*) Hartnagel told Correia "to go talk to Ed Marck," the chassis liaison in the safety office. (*Id.*)

Since Marck was not in his office at that time, Correia called him. (*Id.*) Again, Correia relayed what he had heard from Kasper, told him that Kasper would be sending them the affected parts, and "told him that [they] need to contact NHTSA about this issue." (*Id.*) Marck responded that they needed to get the parts and said that he was going to call Kasper directly and "report his findings back to [Correia] the next day." (ECF No. 71-14, PageID.735.) But Correia testified that Marck did not get back to him (*Id.*)

About a week later, on November 9, 2015, Correia gave a presentation to Hartnagel, Marck, Mark Lungren, and Jerry Herman. (ECF No. 71-14, PageID.735.) During this presentation, Correia raised the drag-link-ball-joint concern in the Atlanta ambulance fleet and stated that he "was going to report this issue to an agency, to NHTSA, if [FCA] [did not]." (ECF No. 71-14, PageID.740.) He stated that next steps would involve getting a materials report. (ECF No. 71-14, PageID.737.) But he never got that materials report and therefore was never able to complete a "root cause analysis" of the drag-link-ball-joint issue prior to his termination. (ECF No. 71-14, PageID.739.) Instead, three days after Correia's presentation, Hartnagel made the decision to fire him. (ECF No. 72-25, PageID.2218.) Correia's last day was on December 1, 2015. (ECF No. 71-14, PageID.699.)

3

Correia eventually did contact NHTSA about the issue at the end of December 2015 and into the beginning of January 2016. (ECF No. 72-14, PageID.739.)

FCA also submitted a report to NHTSA about the issue in February 2016. (ECF No. 71-17, PageID.899.) There is nothing in the record about any response from or action taken by NHTSA.

In February 2016, Correia filed this lawsuit alleging that he was terminated because he threatened to report that FCA was made aware of a safety issue but failed to report it within five working days, as required by the Consent Order and under federal law. This, he says, violates the Federal False Claims Act and the Michigan Whistleblower Protection Act.

FCA now moves for summary judgment.

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

## III.

### A.

Correia brings a reverse False Claims Act retaliation claim. A False Claims Act allegation is based upon a false or fraudulent claim for payment or approval; essentially, lying to the federal

government to receive federal funds. 31 U.S.C. § 3729. An entity commits a reverse False Claims Act violation when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay . . . the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay . . . the Government." 31 U.S.C.A. § 3729 (a)(G). The essence of Correia's allegation is that FCA concealed information in order to avoid an obligation under the Consent Order to pay NHTSA.

The False Claims Act provides anti-retaliation protection to private individuals who bring fraud to the government's attention or who try to stop the fraud itself. 31 U.S.C. § 3730(h)(1). To establish a claim of retaliatory discharge, a plaintiff must show "(1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity" *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008) (citation omitted).

"[I]nternal reports of fraud may constitute protected activity so long as they allege activity with a nexus to a *qui tam* action, or fraud against the United States government." *Miller v. Abbott Laboratories*, 648 F. App'x 555, 559 (6th Cir. May 2016) (internal quotation omitted). "To constitute protected activity, an employee need not complete an investigation into potential fraud or uncover an actual [False Claims Act] violation because the [False Claims Act's] anti-retaliation provision protects employees while they are merely collecting information about potential fraud." *Id.* at 560 (internal quotations omitted). "However, an employee's activities must reasonably embody 'efforts to stop' [False Claims Act] violations." *Id.* (internal quotation omitted). "[A]n employee's investigation into alleged fraud is protected only where: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Jones-McNamara v. Holzer*

*Health Sys.*, 630 F. App'x 394, 399–400 (6th Cir. 2015) (quoting *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir.2004)). "Therefore, although [Correia] need not establish that [FCA] actually violated the [False Claims Act], [he] must show that [his] allegations of fraud grew out of a reasonable belief in such fraud." *Id.*

Here, Correia alleges that FCA violated the False Claims Act by failing to report a defect, as required under the terms of its Consent Order, in order to avoid an obligation to pay NHTSA. More specifically, Correia believes that once five days had passed after he first mentioned the safety issue and FCA failed to report the issue to NHSTA, FCA was then obligated to pay the government part of the deferred fine. And FCA was concealing its violation of the Consent Order in order to avoid paying that fine. So, says Correia, he engaged in protected activity when, on November 9, 2015, he threatened to contact NHTSA after more than five days had passed since notifying FCA about the safety concerns.

This claim arises from the terms of the Consent Order. Correia argues that FCA was in violation of Paragraph 2, which provides that "[a] manufacturer must submit the Defect and Noncompliance Information Report not more than five working days after it knew or should have known of a safety-related defect or noncompliance in its vehicles. See 49 C.F.R. § 573.6(b)" (ECF No. 72-14, PageID.1662.) And Correia argues that Paragraph 18 obligated FCA to pay for that violation. (ECF No. 72, PageID.1016–1017.) That paragraph provides that, of FCA's total penalty for its late reporting of safety defects, $15,000,000 would be deferred pending FCA's "satisfactory completion" of the Order. (ECF No. 72-14, PageID.1666.) Paragraph 21 of the Consent Order provides instructions as to how that $15,000,000 would be paid:

> Should NHTSA receive notice from the Independent Monitor as set forth in Paragraph 42, or should NHTSA make its own determination, that FCA US has violated the Safety Act, regulations thereunder, or the terms of this Consent Order, a lump-sum payment of three million dollars ($3,000,000) from the Deferred

6

> Amount will become due and owing to the U.S. Treasury within ten (10) calendar days, in accordance with the instructions provided by NHTSA.

(*Id.*) Second and third violations would result in heightened penalties until the entire deferred fee had been paid. (ECF No. 72-14, PageID.1666–1667.)

FCA argues that this claim fails as a matter of law. While not abundantly clear, FCA appears to be making two different, but related, arguments: first, that it was not reasonable for Correia to believe that FCA had violated Paragraph 2 of the Order by failing to report the alleged defect within five days of Corriea first mentioning it; and second, it was not reasonable to believe that the alleged violation amounted to fraud because the Order did not create an immediate obligation to pay. (*See* ECF No. 71, PageID.644–646.)

The Court starts with the first argument.

No reasonable jury could find that it was reasonable to believe that FCA was in violation of Paragraph 2 of the Order at the time of Correia's presentation. The full paragraph reads as follows:

> A manufacturer of a motor vehicle that decides in good faith that the vehicle contains a defect related to motor vehicle safety or does not comply with an applicable federal motor vehicle safety standard must notify NHTSA by submitting a Defect and Noncompliance Information Report. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6. A manufacturer must submit the Defect and Noncompliance Information Report not more than five working days after it knew or should have known of a safety-related defect or noncompliance in its vehicles. See 49 C.F.R. § 573.6(b).

(ECF No. 72-14, PageID.1662.)

Correia ignores the first sentence – that FCA's reporting obligation is triggered when it decides, in good faith, that one of its vehicles has a safety defect, and not simply when an employee brings an issue to its attention. In *Jones-McNamara v. Holzer Health Syst.*, 630 F. App'x 394 (6th Cir. 2015), the plaintiff alleged that her former employer accepted remuneration from an ambulance company, a jacket and some hotdogs and hamburgers at an annual health and wellness

7

fair, as an inducement to refer patients to that ambulance company. She claimed the ambulance company was submitting claims to the federal government that violated the FCA by seeking reimbursement for ambulance services procured from Holzer through illegal bribes: namely, the jackets and hot dogs. The Sixth Circuit found plaintiff's belief to be objectively unreasonable because "it is ludicrous to believe that a person would be tempted to make illegal referrals in exchange for a couple hotdogs once a year." 630 F. App'x at 402.

Similarly, it is not reasonable to believe that, at the moment Correia first alerted FCA to a possible ball joint issue in the Atlanta ambulance fleet, FCA had determined or should have determined that there was a safety defect sufficient for it to be required to immediately report that defect to NHTSA pursuant to the Consent Order. When Correia went to Hartnagel after his meeting, Hartnagel told Correia to speak with Marck in the Safety Office. (ECF No. 71-14, PageID.734.) Not surprisingly, Marck told Correia that they needed to get the affected parts and that Marck was going to contact Kasper directly about the problem. (ECF No. 71-14, PageID.735.) Indeed, in Correia's own presentation, he acknowledged that the next steps included a materials report, but that he did not receive the report in order to complete a "root cause analysis" of the drag link ball joint issue prior to his termination three days later. (ECF No. 71-14, PageID.737, 739.) Correia also knew that there was a plan for FCA engineers to visit the fleet. (ECF No. 71-14, PageID.737.) None of these steps indicate that FCA had concluded, one way or another, whether the drag link ball joint issue was a safety defect warranting a report. Rather, the activity that took place both after Correia's October 28 meeting and November 9 presentation is indicative of a company investigating a potential issue. So again, no reasonable jury could find that it was reasonable for an FCA employee to believe that, as of October 28, FCA had a legal obligation, to report a safety issue caused by an automotive part defect to NHTSA.

8

But, even assuming such a belief was reasonable, FCA argues that the Consent Order did not obligate FCA to pay at the moment the Order was violated, and therefore it was not committing fraud against the government at the time of Correia's presentation a few days after he reported the safety concern.

The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). This definition has been interpreted to mean that the duty to pay needs to be established at the time of the alleged protected activity, but the amount need not be fixed at that time. *See, e.g.*, *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016); *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 504–507 (3d Cir. 2017) (reviewing legislative history of the False Claims Act to conclude that "the definition of an 'obligation' refers to one existing at the time of the improper conduct to pay the Government funds."). "[I]n the absence of acknowledged liability, whether an 'obligation' exists depends entirely on what the relevant legal instrument—be it a contract, regulation, statute, or judicial order—required a party to do." *United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 271–272 (D.D.C. 2016) (emphasis added).

Thus, an "'obligation' does not include 'those contingent obligations that arise only because the government has prohibited an act, or arising after the exercise of government discretion.'" *United States ex rel. Ibanez v. Briston-Myers Squibb Co.*, 874 F.3d 905, 922 (6th Cir. 2017) (quoting *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 741 (6th Cir. 1999)) (superseded by statute as stated in *Simoneaux*, 843 F.3d at 1033); *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1231 (10th Cir. 2017) ("[T]here is no liability for

9

obligations to pay that are merely potential or contingent."), petition for cert. filed, No. 17-1509 (U.S. May 7, 2018).

One example of a contingent obligation is regulatory statutes under which an actor only needs to pay should the government choose to levy a fine for a violation. *See Simoneaux*, 843 F.3d at 1040 (holding that, because the Toxic Substances Control Act gives EPA discretion whether to assess a penalty for a violation, duPont's violation of that statute will not support a reverse false claim); *see also Landis*, 160 F. Supp. 3d at 256 (violation of sponsorship agreement that permitted the government to seek damages in the event of a breach did not support a reverse false claim). "[M]ost regulatory statutes . . . impose only a duty *to obey the law*, and the duty to pay regulatory penalties is not 'established' until the penalties are assessed." *Simoneaux*, 843 F.3d at 1039–40 (emphasis added). In *Simoneaux*, the Third Circuit found that even with statutes imposing mandatory penalties, it had never held that "a duty to pay" would arise "at the moment [the statute] is violated." *Id*. at 2041. Rather, the penalties "are mandatory only in the sense that *once a violation has been established*, some form of penalty is required." *Id*. (internal quotations omitted) (emphasis added).

In contrast, courts have found that "a violation of a statute that imposes a fee by its own terms, without requiring further government action, constitutes an obligation that supports a reverse false claim." *Jacobs v. Bank of Am. Corp.*, No. 1:15-CV-24585-UU, 2017 WL 2361944, at *3 (S.D. Fla. Apr. 27, 2017) (citing *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016)). Such laws "impose a duty to pay" as opposed to just a "duty to obey the law." *Simoneaux*, 843 F.3d at 1039–40. One such example is The Tariff Act of 1930. The Tariff Act requires that pipe fittings be marked with the English name of the country of origin. *Victaulic*, 839 F.3d at 246. And "[i]f an importer releases unmarked or improperly

marked goods into the stream of commerce in the United States, the importer owes a duty of 10 per centum ad valorem on the improperly marked goods." *Id*. The Third Circuit found that this law creates an obligation to pay the moment an unmarked good is released into the country. *Id*. at 254. Indeed, the legislative history indicates that the Senate intended for such customs duties to fall under the definition of "obligation." *Id*. at 253–254. Policy reasons also supported the holding: "[c]ustoms officials at United States ports of entry are unable to inspect every import; they rely primarily on the importers themselves to self-report any duties owed and any goods that are unmarked or improperly marked." *Id*. at 253–254.

The Consent Order creates only a contingent duty to pay. The paragraph that Correia asserts FCA violated recites requirements under the Safety Act and its accompanying regulations. (ECF No. 72-14, PageID.1662.) It does nothing more than require FCA to follow the law. But it adds a mechanism that makes it easier for NHTSA to fine FCA *should NHTSA find* that *FCA violated that law*. This is different than a statute or agreement that *requires payment*.

Further, the plain language of the provision at issue (Paragraph 21) does not create an obligation to pay the moment FCA believes it may have violated the Order. Instead, that obligation is contingent upon NHTSA action. The provision states that should the *Independent Monitor or NHTSA* find that FCA violated the Order, FCA needs to pay within 10 days of that determination. (ECF No. 72-14, PageID.1666.) Thus, the Order did not obligate FCA to pay $3,000,000 right after Correia's November 9 presentation, because NHTSA had not yet determined there was a violation.

In sum, because the relevant provisions of the Consent Order concern complying with existing law and require that NHTSA determine there is a violation prior to any obligation by FCA to pay, the Consent Order did not create an obligation to pay at the moment FCA may have violated

one of the terms. And Correia has not provided any evidence as to why it would be objectively reasonable to believe that FCA had an obligation to pay NHTSA as of Correia's November presentation. Thus, the Court finds that, as a matter of law, Correia did not engage in protected conduct. *See Jones-McNamara*, 630 F. App'x at 404.

So FCA is entitled to summary judgment on Correia's False Claims Act claim.

**B.**

This leaves Correia's claim under Michigan's Whistleblower Protection Act. When, as here, the federal claim is dismissed before trial, and only a state claim remains, federal courts often decline to exercise supplemental jurisdiction over the state-law claim. *See, e.g.*, *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). In deciding whether to exercise jurisdiction, the Court's task is to weigh "judicial economy, convenience, fairness, and comity." *Id.*

These factors point to dismissal. True, the parties have completed extensive discovery and summary judgment motions. But that discovery is still useful in the state courts and would not need to be repeated. The case has been narrowed to a single claim that can be re-briefed in state court. And, by the Court's estimate, Correia still has sufficient time to refile this claim in state court given that the statute of limitations has been stopped during the pendency of this litigation. *See Artis v. District of Columbia*, 138 S.Ct. 594, 598 (2018). Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state claim.

**IV.**

For the reasons stated, FCA's motion for summary judgment (R. 71) is GRANTED in part and this case is DISMISSED.

IT IS SO ORDERED.

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
UNITED STATES DISTRICT JUDGE

Date: January 2, 2019

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 2, 2019.

s/William Barkholz<br>
Case Manager to<br>
Honorable Laurie J. Michelson